# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| HUMBERTO MIGA,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>JARED R. JAMIS and BKD, LLP,<br><br>　　　　　　　　　Defendants. | Case No.: 3:19-CV-00085<br><br>**ACTION FOR DAMAGES**<br><br><u>JURY TRIAL DEMANDED</u> |

### **SECOND AMENDED COMPLAINT**

COMES NOW Plaintiff HUMBERTO MIGA, by and through his counsel, Ryan W. Greene, Esq., and hereby files his Second Amended Complaint against Defendants JARED R. JAMIS and BKD, LLP as follows:

1. This Court has jurisdiction of the subject matter pursuant to 28 U.S.C § 1332(a)(2).

2. Venue is proper in the District of St. Thomas/St. John as the events and collision complained of herein occurred on St. Thomas, U.S. Virgin Islands.

3. Plaintiff Humberto Miga ("Plaintiff") is a resident and citizen of St. Thomas, U.S. Virgin Islands.

4. Defendant Jared R. Jamis ("Jamis") is a resident of Wichita, Kansas, but was staying on the Island of St. Thomas and was acting within the scope of his employment with BKD, LLP on May 12, 2019, when he caused the incident complained of that forms the basis for this lawsuit.

5. Defendant BKD, LLP is a Missouri corporation with its principal place of operations in Springfield, MO, who, upon information, is and was the entity that employed Jamis at all times relevant to the allegations in this complaint.

6. BKD is an accounting and advisory firm. Specifically, BKD, LLP, formerly Baird, Kurtz & Dobson, founded in 1923, is one of the largest U.S. accounting and advisory firms, providing consulting, tax, assurance and accounting outsourcing solutions to businesses, government entities, not-for-profit organizations and individuals.

7. BKD has 40 offices in 18 states and serves clients in all 50 states. BKD's national office is located in Springfield, Missouri.

8. In 2019, BKD reported net revenues of $662.9 million and employed approximately 2,800 personnel, including roughly 300 partners.

9. BKD Partner Anthony "Tony" Kruse ("Kruse") is a partner in the Wichita, Kansas Office.

10. In or around the first half of 2019 Kruse and BKD were engaged by a client in St. Thomas. BKD determined that the client required audit work that would be done on St. Thomas.

11. BKD, through Kruse, selected an "Audit Team" comprised of two BKD Certified Professional Accountants (CPA) to send to St. Thomas in May of 2019 to serve the client on St. Thomas.

12. BKD, through Kruse, selected BKD Manager Dustin Redger ("Regder") as the "in-charge" of the Audit Team selected to represent BKD during the trip to St. Thomas.

13. Redger joined BKD in 2012. In 2019, he was a Manager in BKD's Wichita office.

14. BKD, through Kruse, also selected Jamis as the Associate that reported to, and assisted, Redger during the trip.

15. Neither Jamis nor Redger had ever been to St. Thomas, U.S. Virgin Islands, and Jamis did not have experience driving on the left.

16. Redger had been to St. Croix more than five times for work another Client of BKD and Tony Kruse located on St. Croix (the "St. Croix client").

17. Jamis had accompanied Redger on trips to St. Croix to serve the prior client in 2016 and 2018, but Jamis did not drive or rent a car on St. Croix during those trips to serve the St. Croix client.

18. Jamis's and Redger's flights to St. Thomas were booked through BKD's preferred third-party travel agency, as required by company policy.

19. It was determined that Jamis would rent a car upon arrival in St. Thomas, which was charged as a business expense, so they would have transportation at their disposal on St. Thomas.

20. The two men knew one another as they both were CPA's in BKD's Wichita, Kansas office and lived in the Wichita area.

21. On the day of their scheduled departure, Redger and Jamis met at the airport in the early morning of May 11, 2019.

22. Jamis believes he would have reached the airport about an hour before his scheduled flight; thus, he would have left his home even earlier.

23. Their first scheduled flight was scheduled to depart Wichita (ICT) in the early morning of May 11, 2019, on United Airlines flight number 2019, a non-stop to Houston George Bush Intercontinental (IAH). Although this flight was scheduled to depart at 6:40 a.m., it was delayed.

24. Because the first flight was delayed, the men stated they missed their second scheduled flight, which was United Airlines flight number 1123 from IAH to St. Thomas (STT). This flight would have taken them to STT by around 3:40 p.m.

25. Having missed the non-stop flight to STT, Jamis and Redger were rebooked for same-day travel from Houston to San Juan, Puerto Rico, also on United Airlines.

26. Once Jamis and Redger arrived in San Juan they took their third and last flight of the day, a Cape Air flight from SJU to STT, which arrived at Cyril E. King Airport in the evening, around 6:00 p.m.

27. Jamis rented a new 2019 Nissan Rogue SUV at Budget, which was a business expense ultimately charged to BKD's client.

28. Although Redger was present when the vehicle was rented, and Redger made the reservation initially in his own name, it was determined that Jamis would drive and be the only authorized driver for the vehicle.

29. This decision was made notwithstanding the fact that Redger had experience driving on the left, whereas Jamis did not.

30. The vehicle only had 1,024 miles on the odometer at the time of the rental and according to Jamis there were no defects with the vehicle that contributed to or caused the collision.

31. The BKD audit team was met at the airport by either the son of the Villa Manager or the Villa Manager himself.

32. From the airport Jamis drove the SUV, with Redger as his passenger, following the individual who met them at the airport to the Villa (Villa Lima, located on the south side of St. Thomas).

33. Once the men got to the Villa Jamis drank rum and coke and Redger drank rum and coke, as well.

34. Jamis testified that the bottle of rum was in the Villa as a welcome, along with some cans of coke.

35. The men then left the Villa and went to Kmart where Redger bought a six-pack of Presidente beer, among other items purchased at 8:10 p.m.

36. The beer was charged as a business expense.

37. The beer was reportedly in the car as they left Kmart and spent time in the Havensight area to "check it out."

38. A stop was made at the Tap & Still in Havensight where the men drank more alcohol and reportedly had some food.

39. The men then left the Tap & Still at an unspecified time, possibly "nine-thirtyish" and claim to have driven around looking for the landmark of two "white gates" to make a turn to their rental villa for several hours, until the collision occurred.

40. At the time the men left Tap & Still, and even before that time, Redger had actual knowledge that Jamis had consumed alcohol, had been travelling all day, and was unfamiliar with St. Thomas, and had no experience with driving on the left.

41. In spite of his knowledge of these facts, BKD Manager Redger never suggested the men call a taxi, find a ride, or even walk rather than to allow Jamis to drive.

42. Instead Redger allowed Jamis to turn on the ignition of the SUV, leave the parking lot, and go out onto the public roadway with alcohol in his system, tired from travel all day, with no knowledge of driving on the left, and with no map or directions to the Villa.

43. According to Jamis, he and his Manager, Redger, were lost and were looking at a "Google map" on Redger's phone "trying to get their bearings." According to Jamis, Redger was frustrated that Jamis could not find the Villa during this time period.

44. Although Jamis had the phone number (340) 514-9441 in his cell phone call log, which is the number for Randy Doty's Villa rental company, in his phone he did not stop driving to call the Villa rental company or anyone who picked them up at the airport to ask for directions to the Villa.

45. Phone records reveal that Jamis called BKD Partner, Tony Kruse, who is based in Kansas at 11:47 p.m. on May 11, 2020 for a call of three-minutes duration.

46. Although Redger had an email with the phone number (340) 514-9441 in his cell phone as the men drove around for hours "lost", which is the number for Randy Doty's Villa rental company, in his phone he did not stop driving to call the Villa rental company or anyone who picked them up at the airport to ask for directions to the Villa.

47. According to Jamis, his phone stopped working at some point prior to the collision.

48. According to Jamis, during the two to two and a half hours the men drove looking for the turn to the Villa they never once stopped to flag down another motorist to ask for directions.

49. According to Jamis, during the two to two and a half hours the men drove looking for the turn to the Villa they never once stopped at any place to get directions.

50. In spite of being a BKD Manager, Redger failed to take charge of the situation to get them to the Villa safely.

51. On May 12, 2019, at approximately 2:45 a.m. to 3:00 a.m., Plaintiff was traveling west while operating his 2007 Nissan Altima on Frenchman's Bay Road, Hwy. 315, in the vicinity of the Antilles School on St. Thomas, VI.

52. Plaintiff had been at home resting and sleeping but had gotten out of bed to make an early morning trip as a favor to pick-up his good friend from work, as his friend did not

have transportation and was just then getting off of work from his shift working Security in town.

53. At that time, Defendant Jared R. Jamis and Redger were in the 2019 Nissan Rogue SUV traveling east on the same road, in the westbound lane, and collided head on into the front of Plaintiff's vehicle, thereby causing a collision.

54. Jamis admitted that he had reverted to driving in the right hand lane as if he was in the States.

55. The rental vehicle collided with Plaintiff's vehicle head on at full speed which Jared R. Jamis testified was 30-40 m.p.h.  Jamis said he "tapped" the breaks "at the last minute."

56. According to Jamis, although the two men had been looking at "Google maps" on Redger's phone while driving, Jamis does not recall if looking at the map distracted him from driving.

57. In spite of knowing that he was taking a trip to an island he was totally unfamiliar with and having a BKD Associate who had never driven on the left serve as his driver, Redger, as a BKD manager, did not secure a map to the Villa or write down directions to the Villa.

58. Following the collision, Virgin Islands Police Officer L. Peru, PDN #1306, responded to the scene and cited Defendant Jared R. Jamis with violation of 20 VIC Title 495(a) for failure to remain as far left as possible, thereby, causing an auto collision with damages.

59. Officer Peru also noted in the report that Jamis had admitted to consuming alcohol.

60. There was also beer in the cupholder of the SUV at the time of the crash, which Jamis claims was "not his."

61. The only other person in the SUV who could have had the beer, if it was not Jamis's, was Redger.

62. Both vehicles were demolished due to the force of the crash. As such, both vehicles were inoperable, had to be towed from the scene, and were both later declared a total loss.

63. Neither Redger nor Jamis called 911. Plaintiff was still stuck in his smoking and demolished vehicle, because he could not exit it with a severely broken leg, called 911 reporting "I need help."

64. Officer Peru called VIPD Command about a possible drunk driver, but receiving no response (by this time it was around or past 4 a.m.). Officer Peru plainly could see the laceration to Jamis's left knee bleeding, as well as Redger's bruises from being hit by the passenger's side airbag, and, therefore, took the two men to Roy Lester Schneider Regional Medical Center's Emergency Room.

65. In spite of the officer dropping the men to the Emergency Room, after the VIPD left them there, they determined that they would walk from the Hospital to the Villa, which is on the Southside of St. Thomas rather than to seek medical attention.

66. In spite of it being a shorter walk to have walked home from Tap & Still Havensight to the Villa in the first place, the men elected to drive and not take a taxi.

67. This conscious decision ended up with them taking a long walk, having just been in a major automobile collision, from RLS Emergency Room parking lot to the Villa.

68. The same morning of the collision, May 12, 2019, BKD Manager Redger sent a text to BKD Partner, Anthony (Tony) Kruse at 11:40 a.m., falsely stating: "Tony we were in a car accident last night….".

69. This statement is demonstrably false as the VIPD Official Crash Report and VITEMA 911 records dated May 12, 2019 show the crash was reported at around 2:53 a.m. – 2:54 a.m.

70. On May 17, 2019, the BKD Benefits Department, acting though Melanie Jones, emailed Jamis at 3:48 p.m. stating: "I was made aware of your car accident and injury while travelling for work. Please complete the Report of Injury Form [found here]. I will use the information you provide to report the injury to The Hartford and they will process your Worker's Compensation application."

71. Jamis completed the Worker's Compensation Report of Injury Form and BKD's Benefits Department filed his Worker's Compensation claim with The Hartford, who assigned it Claim Number Y95C37828 with Date of Loss of May 12, 2019.

72. Although Jamis had private health insurance at the time of the crash, both BKD and Jamis reported the incident as a Worker's Compensation claim.

73. Because Jamis and BKD filed a Worker's Compensation claim (Claim Number Y95C37828) both Jamis and BKD acknowledged that the incident occurred during the course and scope of Jamis's employment with BKD.

74. As a direct result of Defendants' negligence, Plaintiff suffered serious physical and psychological injuries, medical expenses, loss of income, property damages, loss of use of Plaintiff's vehicle, disfigurement, loss of capacity to earn income, mental anguish, pain and suffering, and loss of enjoyment of life, all of which are expected to continue into the foreseeable future.

75. After EMTs were able to get the Plaintiff out of the remains of his vehicle, it was determined at the RLS Hospital that Plaintiff's femur was broken in two places. Dr.

Jeffrey Chase had to perform surgery to open Mr. Miga's leg to fix each of the breaks in place with screws and rods (see photos and x-ray attached). Mr. Miga had to be hospitalized for three (3) days, and was discharged for additional treatment with Dr. Chase which later also included physical therapy.

### COUNT I
### NEGLIGENCE/GROSS NEGLIGENCE

76. The Plaintiff repeats and re-alleges all preceding paragraphs 1-75, which are incorporated herein by reference.

77. The Defendant Jared R. Jamis, was negligent, including but not be limited to:

    (a) Failing to stay in his lane of traffic and drive as far left as possible;

    (b) Failing to take proper evasive action;

    (c) Violating 20 V.I.C. 495(a), failure to remain as far left as possible, which constitutes negligence and negligence *per se*;

    (d) Operating his vehicle in a reckless and dangerous manner;

    (e) Failing to keep a proper lookout at the time of the collision and immediately preceding the collision;

    (f) Failing and neglecting to keep his vehicle under proper control and admittedly being under the influence of alcohol;

    (g) Failing to exercise due care and caution for the safety of others, specifically and including, Plaintiff Humberto Miga, by operating the company vehicle in such a manner that he failed to keep a safe distance between vehicles and, therefore, colliding into the Plaintiff's vehicle resulting in serious injuries and damages to Plaintiff; and

    (h) Committing other acts, omissions and conduct that will be shown at the trial of this matter.

78. Defendant Jared R. Jamis owed a legal duty to the Plaintiff and to others to use an ordinary degree of care in driving the vehicle that resulted in the subject collision on May 12, 2019.

79. Defendant Jared R. Jamis breached said duty owed to the Plaintiff.

80. Immediately prior to and at the time of the collision, Plaintiff's 2007 Nissan Altima was in good mechanical condition. As a further proximate result of the negligence of Defendant, as alleged herein, Plaintiff's automobile was damaged to the extent it was considered a total loss.  Prior to the collision on May 12, 2019, the Blue book value of Plaintiff's vehicle was $4,970.00.

81. As a direct and proximate result of Defendant's breach and outrageous actions and gross negligence driving in the wrong lane of travel on a public roadway while under the influence of alcohol, the Plaintiff has been damaged in amounts to be proven at trial as alleged herein.

### COUNT II
### (*Respondeat Superior Liability – Against BKD, LLP*)

82. Plaintiff repeats and re-alleges all preceding paragraphs 1-75, which are incorporated herein by reference.

83. At all times relevant hereto, Defendant R. Jamis was employed by, and was an agent, servant and/or employee of BKD, LLP.

84. "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Covington*

*v. Int'l Ass'n of Approved Basketball Officials,* 710 F.3d 114, 120 (3d Cir.2013). BKD, LLP selected and assigned Jamis and Redger to travel to St. Thomas to act on its behalf as its agents at all times during the business trip, as shown by BKD, LLP's willingness to pay for lodging, the rental car, and meals, including beer and other alcoholic beverages. BKD, LLP further ratified the acts including by processing the Worker's Compensation claim for Jamis.

85. The above-described acts of Defendant Jared R. Jamis were committed within the scope of his employment with Defendant BKD, LLP in that they were committed while on duty and in furtherance of the business of Defendant BKD, LLP.

86. As Defendant Jared R. Jamis's employer, Defendant BKD, LLP is responsible for the negligent acts committed by Defendant Jared R. Jamis within the scope of his employment pursuant to the doctrine of *respondeat superior*.

## COUNT III
### (*Negligent Supervision– Against BKD, LLP*)

87. Plaintiff repeats and re-alleges all preceding paragraphs 1-75, which are incorporated herein by reference.

88. BKD, LLP is liable to Plaintiff for negligent supervision due to (1) the existence of an employment relationship between BKD and Jamis; (2) the employee's (Jamis's) incompetence, as complained of herein; (3) the employer's actual or constructive knowledge of such incompetence, including here its knowledge through its Manager, Redger, who was the "in-charge" for Jamis on the trip in question and had actual knowledge that Jamis had been drinking alcohol and was not familiar with driving on the left and was, therefore, driving in the wrong lane of travel while such conduct was

actually occurring; (4) the employee's (Jamis's) act or omission causing plaintiff's injuries, specifically the collision complained of herein; and (5) the employer's negligence in failing to supervise Jamis, and in retaining the employee (Jamis) as he did the acts complained of herein was the proximate cause of the plaintiff's injuries.

89. Section 7.05 of the Restatement (Third) of Agency provides, in pertinent part: "(1) A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent." Restatement (Third) of Agency § 7.05.

90. BKD is liable to Plaintiff for its negligent supervision of Jamis, and of Redger, (a) in giving improper or ambiguous orders or in failing to make proper regulations; or (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others; or (c) in the supervision of the activity; or (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.  Restatement (Second) of Torts § 317 (1965) provides:

> A master is also under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
> > (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

>   >   (ii) is using a chattel of the master, and
>
> (b) the master
>
>   >   (i) knows or has reason to know that he has the ability to control his servant, and
>
>   >   (ii) knows or should know of the necessity and opportunity for exercising such control.

91. Here, Jamis was clearly acting in the scope of employment as proven by the Worker's Compensation claim, but in the alternative BKD, LLP is liable to Plaintiff for its negligent supervision of Jamis in that it failed to prevent Jamis from conducting himself in a manner that created unreasonable risk of harm to Plaintiff by (a) allowing Jamis to drive in a car it paid for and on an island with which it knew he was not familiar; (b) allowing Jamis to purchase and consume alcoholic beverages and to charge them as a business expense; (c) by allowing Redger to allow Jamis to drive in an inebriated state; because BKD, LLP knew or had reason to know that drinking alcohol and driving is unsafe and BKD, LLP knew or should have known of the necessity of creating guidelines to prevent drinking and driving while on company travel.

WHEREFORE Plaintiff prays for damages as they may appear, for pre and post judgment interest, and costs and fees, and for punitive damages against Defendants as are warranted by the facts, and for such other relief as this court deems just and appropriate.

**A TRIAL BY JURY IS DEMANDED AS TO ALL ISSUES.**

                Respectfully submitted,

Dated: August 17, 2020       */s/ Ryan W. Greene*
                Ryan W. Greene, Esq.
                VI Bar No. 839
                15-B Norre Gade
                P.O. Box 1197
                Charlotte Amalie, St. Thomas
                U.S. Virgin Islands 00802
                Telephone: (340) 715-5297
                Fax: (888) 519-7138
                ryan@ryan-greene.com